## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

HENRY HARRISON BALL, JR.,

     Plaintiff,

v.                                  CIVIL ACTION NO. 2:21-cv-00027

KILOLO KIJAKAZI,[1]
Acting Commissioner of the
Social Security Administration,

     Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Henry Harrison Ball, Jr. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 1.) By standing order entered on January 4, 2016, and filed in this case on January 15, 2021, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's Brief in Support of His Motion for Judgment on the Pleadings (ECF No. 12) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 13).

---

[1] Kilolo Kijakazi is now the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d). *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse or remand the Commissioner's decision (ECF No. 6), **GRANT** the Commissioner's request to affirm her decision (ECF No. 7), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 45 years old at the time of his alleged disability onset date and 47 years old on the date of the decision by the Administrative Law Judge ("ALJ").  (Tr. 92, 272-73.)[2]  He is a high school graduate. (Tr. 65)  Most recently, he worked as a coal miner, and he has also been employed as a cement mason and security guard.  (*Id.*)  Claimant alleges that he became disabled on December 19, 2018, due to bipolar disorder, anxiety disorder, schizoaffective disorder, depression, anger issues, diabetes mellitus, stage III kidney disease, bulging disc in his low back, nerve damage, and COPD.  (Tr. 279, 301.)

Claimant filed his application for benefits on October 22, 2019.  (Tr. 133.)  His claim was initially denied on January 24, 2020, and again on reconsideration on April 29, 2020.  (Tr. 114-132, 155-177.)  On May 26, 2020, Claimant filed a written request for hearing. (Tr. 218.)  An administrative hearing was held before an ALJ on October 6, 2020. (Tr. 59-91.) Appearing from Charleston, West Virginia, the ALJ conducted the hearing by telephone pursuant to 20 C.F.R. § 404.936(c) at Claimant's request due to the extraordinary circumstances presented by the Coronavirus Pandemic. (*Id.*)

On November 3, 2020, the ALJ rendered an unfavorable decision (the "ALJ's Decision"). (Tr. 12-29.) Claimant then sought review of the ALJ's decision by the Appeals

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 10.

Council on November 3, 2020. (Tr. 1.) The Appeals Council denied Claimant's request for review on December 22, 2020, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 1-6.)

Claimant timely brought the present action on January 12, 2021, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 9) and a transcript of the administrative proceedings (ECF No. 10). Claimant subsequently filed his Brief in Support of His Motion for Judgment on the Pleadings (ECF No. 12), and in response, the Commissioner filed her Brief in Support of Defendant's Decision (ECF No. 13). As such, this matter is fully briefed and ready for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence,[3] pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

On June 23, 2016—approximately two and a half years before the alleged onset date—Claimant presented at OP Psychiatric Services and reported the following:

> having problems hearing voices on and off for four years, voices of people who were killed in the mines years ago, gets angry because ex-wife keeping daughter from him. Pt. has been down and depressed, no energy, irritable easy, can't sleep. Father died a year ago, says some family members blame him for his father's death.

(Tr. 323, 388.) While Claimant reported visual hallucinations of the devil or monsters, The treating practitioner, David Moore, PA, in the treatment notes from that June 23,

---

[3] As Claimant challenges the ALJ's findings only in regard to his mental impairments, records related to Claimant's physical impairments have been omitted unless relevant to the ALJ's mental-impairment findings. (*See* ECF No. 12.)

2016 visit Moore stated "I do not know if I believe this, [because] patient does not look psychotic." (Tr. 388.) Additionally, the practitioner noted that Claimant was "going to apply for disability. Applied for workers compensation due to injury to back in mines but was turned down, has no income at [the] moment. Ex-wife trying to get patient to pay child support." (Tr. 388.) Claimant's prognosis was for major depression and anxiety. (Tr. 393.) The treatment plan was to start Claimant on Abilify, Lexapro, and Trazodone medications and return in four weeks. (*Id.*)

On August 18, 2016, Claimant returned to OP Psychiatric Services for follow-up. (Tr. 393.) He reported that he went to an emergency room recently where his medication was changed to Seroquel, Buspar, and Wellbutrin XL, which seemed to be doing better. (Tr. 394.) Claimant reported that he was not sleeping well, was having "flashbacks from mines," and got nervous "around a lot of people." (*Id.*) In subsequent months, his Seroquel and Wellbutrin XL dosages were increased and though it was noted that he tolerated the medication well, he continued to report having hallucinations and reported that his quality of life was not good and he could not hold down a job. (Tr. 398-405.) By March 31, 2017, he was prescribed Seroquel, Buspar, Wellbutrin XL, and Paxil. (Tr. 406-409.) He reported feeling down, depressed, and anxious, and that his depression and anxiety were worsening. (*Id.*) Schizoaffective disorder was added as a diagnosis and Buspar and Paxil were increased. (*Id.*)

On July 20, 2017, Claimant returned to OP Psychiatric Services for follow-up and reported "not doing well at all," stating that his life was a mess and he was miserable. (Tr. 414-417.) He did not feel his current medications were helpful and requested a medication change. (*Id.*) He endorsed anxiety, depression, poor sleep, and psychosis. (*Id.*) It was further noted that his appearance was disheveled, his association was circumstantial, his

stream of thought was rapid, his cognitive function was circumstantial and rambling, his voice was fast and loud, he was agitated, his attention and concentration were impaired, his mood was dysphoric, anxious, and irritable, and his affect was sad, anxious, and angry. (*Id.*) His medication was changed to Zyprexa, Effexor, and Valium. (*Id.*)

On August 25, 2017, Claimant returned to OP Psychiatric Services for follow-up, where he reported that he did not feel Effexor helped at all, and Zyprexa made him hallucinate more. (Tr. 418-421.) He reported he was at odds with his family and that his daily activities were limited to staying in his aunt's house where he was living and doing nothing. (*Id.*) His medication was changed to Remeron and Cymbalta, and he was scheduled to follow up in two months. (*Id.*)

On October 9, 2017, Claimant returned for follow-up where he reported that Remeron made him sick and he wanted to sleep too much. (Tr. 422-425.) It was noted that Claimant's mood was irritable and his affect was anxious and angry. (*Id.*) Remeron was discontinued and Doxepin was started at bedtime to aid with sleep. (*Id.*) He was scheduled to follow up in two months. (*Id.*)

At his December 4, 2017 follow-up appointment, Claimant presented with an irritable and swinging mood with a fast and loud voice. He reported that he had various issues with his family, was not doing well, felt angry all the time, and nightly hallucinations. (Tr. 426-29.) He had problems with anger, agitation, and ability to control his mood. (*Id.*) He reported, "I can't concentrate. I used to be on Ritalin." (*Id.*) A prescription for Depakote was added. (*Id.*)

At his January 3, 2018 follow-up appointment, Claimant presented with an anxious and angry affect, and he reported impaired memory, attention, and

concentration. (Tr. 430-33.) Reversing the October 9, 2017 medication change, he was restarted on Remeron at bedtime and Doxepin for sleep was discontinued. (*Id.*)

On February 27, 2018, Claimant began treatment at Westbrook Health Services ("WHS") pursuant to a West Virginia Department of Health and Human Services agency placement. (Tr. 1520, 1596.) Claimant reported poor sleep, increased irritability, and being at odds again with his family. (*Id.*) A mental status exam was normal except for depression, anger, loud speech, and impaired insight. (*Id.*) He was diagnosed with generalized anxiety disorder and "bipolar, affective, mixed, unspecified disorder rule-out." (*Id.*) He was prescribed Effexor XR and Seroquel. (*Id.*)

On January 25, 2019, Claimant presented to his primary care provider at the Morad Hughes Health Clinic for follow-up regarding chest pain and acid reflux. (Tr. 1004.) Claimant reported "that he has stopped his psych med completely" because "[h]e wants to wean off due to gaining weight [and] [h]e felt like his psych meds were causing him to sleep a lot and eat a lot. He says he has been eating limited foot intake" and exercising. (*Id.*) He had "no other reported complaints." (*Id.*)

At a March 21, 2019 follow-up appointment at WHS, Claimant reported continued poor sleep, irritability, and anxiety. (Tr. 1520-27.) A mental status exam indicated marked or repeated sadness, depression, and mood swings. (*Id.*) His Seroquel medication was increased and Trazodone was added for sleep. (*Id.*)

On August 9, 2019—shortly before he filed his application for benefits—Claimant presented to WHS for a follow-up appointment. (Tr. 1537.) He stated that he was "doing good," and reported a good mood, good sleep, low anxiety, good appetite, and good energy since his last visit. (*Id.*) The treatment plan was to continue his current medications and follow up in three months. (*Id.*)

On November 6, 2019, Claimant returned to WHS for his follow-up appointment. (Tr. 1544-1551.) A mental status exam indicated he was physically unkempt, unclean, sad, depressed, angry, hostile, and uncooperative, with mood swings and below average intellectual functioning. (*Id.*) He reported that he had "been alright" since the last visit and was "sleeping good at night." (Tr. 1545.) However, he reported that his medication was "not helping much" and that he "stopped taking" his prescribed Seroquel medication on his own since the last visit because it "was not effective." (Tr. 1546.) He declined a dose adjustment and retrial. (*Id.*) It was noted that Claimant appeared irritable and became agitated when redirected, and that he felt saddened because his father died four years ago around that time of the year. (*Id.*) It was further noted that Claimant declined therapy, stating that he attended therapy in the past which was not helpful to him. (*Id.*)

Following ankle surgery, Claimant presented to triage at Jackson General Hospital on December 1, 2019, with cellulitis in the surgical wound area. (Tr. 759-773.) There, it was noted that his thought process was intact as he understood concepts, responded appropriately, and maintained eye contact; his cognitive process was noted to be intact, as his comprehension, memory, and speech were appropriate; and his mood/behavior was cooperative, calm, and appropriate. (Tr. 767-68.)

On December 28, 2019, Claimant presented to WHS for a follow-up appointment. (Tr. 1552-1559.) It was noted that a different treater took over his care, and he was apprehensive of this new individual. (*Id.*) Claimant reported he had stopped taking all of his psychotropic medications because they were no longer helping. (*Id.*) He reported sleeping three hours per night and endorsed daily paranoia. (*Id.*) Claimant further reported that his anxiety had increased to the point that he could no longer go into a store because "I feel like I am smothering," and he avoided going out in public, preferring to

stay home. (*Id.*) His mental status exam indicated he was physically unkempt, unclean, anxious, depressed, angry, restless, suspicious, uncooperative, and had loud speech. (*Id.*) His mood was inappropriate to thought content, with "marked increased lability of affect" demonstrated by behavior that was markedly angry, verbally apprehensive, and displayed marked mood swings. (*Id.*) It was further noted that Claimant displayed auditory and visual hallucinations. (*Id.*) His treater indicated that Claimant was hard to redirect in the interview and exhibited emotional instability and agitation throughout. (*Id.*) She opined that "there was some definite PTSD present" and that had been why he was so difficult to treat. She started Claimant on a new schedule of medication, with Geodon, Seroquel, Risperdal, and Viibryd, as well as Valium in small doses. (*Id.*)

On January 24, 2020, Claimant presented to West Virginia OrthoNeuro to follow up after his ankle surgery and it was noted that he was alert and cooperative. (Tr. 499.) The same notation was made at a February 12, 2020 follow-up appointment. (Tr. 502.)

On January 27, 2020, Claimant presented to WHS for a follow-up appointment for management of his anxiety and depression medication. (Tr. 1560-66.) He stated he was having ongoing problems with his ex-wife; he reported that she was continuing to "stress him out" and cause him excessive worry, and that he has thought about going into a psychiatric hospital "but does not want to lose his gun rights." (Tr. 1561.) Claimant was advised he would not lose his gun rights if he went voluntarily, but he then denied the need for inpatient treatment. (*Id.*) He reported increased auditory/visual hallucinations of saints and the devil; however, it was noted that Claimant "would not go into detail about them," only that they mostly occur right before bed time, wake him up at times, and that they present more when his anxiety and depression worsen. (Tr. 1561.) He reported sleeping for 3-4 hours at a time. (*Id.*) Claimant endorsed PTSD symptoms including

disassociation, hypervigilance when out, and flashbacks to how his ex-wife treated him in the past. (*Id.*) The treater concluded that Claimant "is most likely exhibiting dissociative symptoms and not true psychosis." (*Id.*) He denied any changes in his energy level and reported he was completing activities of daily living well. (*Id.*) The treatment plan was to continue Claimant's Viibryd medication, increase his Geodon, temporarily increase his Valium, start Prazosin for his night terrors and PTSD symptoms, and start Depakote for agitation and mood stabilization.

On February 10, 2020, Claimant presented to his family medicine provider at the Morad Hughes Health Center for a follow-up appointment regarding back and neck pain; he had been scheduled for a procedure that was delayed due to ankle surgery. (Tr. 1015.) Records from this visit state that Claimant displayed normal cognition, he was "cooperative, healthy appearing and comfortable in no acute distress," and there were "[n]o aberrant behaviors noted." (Tr. 1015-16.)

That same day, Claimant presented to WHS for follow-up with complaints of continuing depression/anxiety. (Tr. 1568-1573.) He reported "he is still feeling nervous at times," but denied any panic attacks or mania. (Tr. 1568.) He reported "doing better" regarding his hallucinations "since increased dose of Geodon" medication, and denied hearing any commanding voices. (*Id.*) He reported that hallucinations were "still present," but "would not go into detail." (*Id.*) He also reported "sleeping well at night and getting 6-7 hours per night." (*Id.*) The treater also noted that Claimant "states he is still trying for disability and it was denied," and that Claimant "asks today if I can write letter to lawyer to tell him 'I'm crazy.'" (*Id.*) The treatment plan was to discontinue Depakote medication "as it caused him to eat excessively" and to "switch" his Valium medication to

Klonopin, but to continue his Geodon, Prazosin, and Viibryd medications and follow up in a month. (*Id.*)

On April 28, 2020, Claimant presented to WHS for a follow-up appointment for his depression and anxiety. (Tr. 1575-1581.) He expressed concern about weight gain and stated that he had asked his primary care physician to prescribe amphetamine salts; the treater advised that given Claimant's psychiatric diagnosis, that type of medication would likely worsen his symptoms. (Tr. 1575.) Claimant reported that his Topamax medication "was over sedating for him and made him feel like a zombie." (*Id.*) He denied any panic attack symptoms but requested an increase in his Klonopin medication, reporting that he had to return early from a trip with his brother to Virginia due to COVID-19 outbreak and that he has been anxious and "worrying about stuff a lot." (*Id.*) It was further noted that Claimant "[h]as chronic back pain so states it is hard to sleep at night," and that he was still having night terrors "a couple times a week." (*Id.*) He denied any hallucinations or psychosis. (*Id.*) It was also noted that Claimant "ask[ed] throughout interview today if I gave his lawyer a good review for his disability hearing" and that Claimant was "[h]ard to redirect" and "easily frustrated." (*Id.*) The treatment plan was to deny Klonopin increase, start Vistaril for sleep, discontinue Topamax, prescribe Viibryd once it is approved by insurance, and follow up in a month. (*Id.*)

On May 11, 2020, Claimant presented to WHS for individual therapy and medication management for his anxiety and depression. (Tr. 1583-88.) He denied any hallucinations or psychosis. (Tr. 1583.) Claimant reported increased anxiety and stated his anxiety was higher than his depression. (*Id.*) He reported not sleeping well at night, only 3-4 hours at a time. (*Id.*) Additionally, Claimant reported having "flash backs to his ex-wife being mean to him especially at bed time." (*Id.*) It was noted that Claimant "does

not believe he has" PTSD and became easily agitated when the provider tried to explain his diagnosis. (*Id.*) It was also noted that Claimant "[k]eeps asking for more benzodiazepines at every appointment," and the treatment plan was to "closely monitor him with medication." (*Id.*) The treater increased his Cymbalta medication to help with anxiety, depression, and PTSD and temporarily increased his Klonopin but "[t]old him I would not increase over this dose and the long term effects of this medication." (*Id.*) Finally, the treater encouraged Claimant "to start therapy again but he had reservations as he stated he did not like the last therapist he had." (*Id.*) After further discussion, Claimant "did say he would re-try therapy again," and the provider "told Henry he has unresolved trauma he needs to work through because medication can only help so much." (*Id.*)

On June 3, 2020, Claimant presented to WHS for individual therapy. (Tr. 1590-1595.) His mood was disgruntled due to the treater running behind with appointments and he expressed frustration with the status of his disability proceedings. (Tr. 1590.) It was noted that Claimant was hard to redirect at first but then calmed down. (*Id.*) He reported that every night, he "has been waking up at night seeing his father at the foot of his bed telling him to get out of the house due to a fire," but it was noted that Claimant "would not go into detail about what he sees and hears." (*Id.*) It was further noted that Claimant "endorse[d] anhedonia," which is a reduced interest in activities and decreased ability to feel pleasure, but Claimant also reported that "he has been doing yard work and getting out of the house." (*Id.*) The treater noted that "[i]t is unclear if this is malingering or true anhedonia[.]" (*Id.*) The treater offered inpatient treatment at a crisis stabilization unit ("CSU") but Claimant "state[d] he does not feel that bad and does not want to go into hospital." (*Id.*) The treatment plan was "to increase his Cymbalta" from 60mg to 90mg

per day "for anxiety/depression" and to "increase Prazosin" from 5mg to 6mg "for PTSD symptoms," with Claimant directed to follow up in a month. (Tr. 1590.)

On July 13, 2020, Claimant presented to WHS via a telemedicine visit and reported night terrors, increased anxiety, and that COVID-19 has been making him worry as well. (Tr. 1766-1771.) It was discussed with him that any new trauma can bring up old trauma and that is likely what he is currently experiencing. (*Id.*) In his mental status examination it was reported that he was unkept, unclean, anxious, depressed, displayed marked restlessness, loud speech, increased lability of affect, mood swings, visual hallucinations and impaired in ability to manage activities of daily living. (*Id.*) His treater indicated she "will work on streamlining medication." (Id.) Claimant was prescribed Amitriptyline, Cymbalta, Geodon, Prazosin, Valium, Vistaril, and Trazodone. (Id.)

On July 15, 2020, Claimant presented to his family medicine provider at the Morad Hughes Health Clinic for a medication refill and gastrointestinal symptoms; it was noted that he engaged in "active listening" and "asked pertinent questions" during this visit, and no depressive symptoms were noted. (Tr. 1746-47.) At a subsequent August 26, 2020 appointment it was noted that he was pleasant and his mood and affect were normal. (Tr. 1758.) During follow-up appointments on August 12, 2020, and August 26, 2020, it was again noted that his mood and affect were normal. (Tr. 1750, 1758.)

*C. Evaluations*

On June 26, 2020, Sarah Garland, APRN—Claimant's treater at WHS—completed a Treating Medical Source Mental Impairment Questionnaire Form. (Tr. 1655-1661.) She reported that Claimant's mental impairments would cause him to be absent from work about three times per month. (*Id.*) She reported that Claimant could manage benefits in his own best interest. She described Claimant's ability to complete a normal

workday/workweek without interruptions from psychologically-based symptoms, sustain an ordinary routine without special supervision, deal with the stress of semiskilled and skilled work, interact appropriately with the general public, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, and use public transportation as "fair," and described his ability to work in coordination with or in proximity of others without being unduly distracted, accept instruction and respond appropriately to criticism from supervisors get along with co-workers or peers without unduly distracting them, or exhibiting behavioral extremes, ability to be aware of hazards and take appropriate actions, and maintain socially appropriate behavior as "poor or none." (*Id.*)

At his request, Claimant was referred by his family medicine provider for a psychological evaluation with ASPIRE Occupational Rehabilitation on August 3, 2020. (Tr. 1716-1723, 1749.) There, the psychologist noted that Claimant appeared with appropriate dress and grooming; was cooperative with good eye contact; his thought processes were understandable and connected; he had no evidence of thought content abnormality; he had good insight; his recent memory was normal, recalling four of four words after delay; his remote memory was within normal limits; and his persistence was within normal limits. However, his mood was depressed with a restricted affect; his judgment was mildly impaired; his immediate memory was mildly impaired, recalling three out of four words; his concentration was mildly impaired; and his pace was "somewhat slow" during evaluation. (*Id.*)

The psychologist then administered 10 subtests of the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV"). (*See id.*) Claimant received a verbal comprehension score of 66, described as an "Extremely Low" score; a perceptual reasoning score of 75, described as a "Borderline" score; and a working memory score of 66, a processing speed

score of 68, and a general ability score of 68—all described as an "Extremely Low" score. (Tr. 1718-19.) The psychologist indicated that the scores from these subtests suggested a full-scale IQ of 63, "in the extremely low range." (Tr. 1718-19.) Claimant was noted to have "performed much better on nonverbal than on verbal reasoning tasks," but "[h]is overall thinking and reasoning abilities exceed those of only approximately 1% of individuals his age." (Tr. 1718.)

### D. The Vocational Expert's Testimony

At the October 6, 2020 hearing before the ALJ, Claimant was represented by counsel and testified on his own behalf. (Tr. 62-86.) After Claimant testified, an impartial Vocational Expert ("VE") testified that an individual with the same age, education, work experience, and credibly-established limitations as Claimant would not be able to return to Claimant's past relevant work, but could perform several representative unskilled sedentary jobs. (Tr. 86-90.)

### E. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v.*

*Heckler*, 769 F.2d 988, 990 n.\* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'"  *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the

fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id*. §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a

listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If he does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether he can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find him "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If he cannot perform other work, the ALJ will find him "disabled." *Id.*

Applying the sequential evaluation process in this case, ALJ Julianne Hostovich determined that Claimant had not engaged in substantial gainful activity since October 22, 2019, the application date. (Tr. 15) She found that Claimant's Major Depressive Disorder, Generalized Anxiety Disorder, Post-Traumatic Stress Disorder, Agoraphobia, Borderline Intellectual Functioning, Reconstruction of the Left Ankle due to Ligament

Tear, Lumbar Spondylosis, Obesity and Cervical Strain/Sprain constituted "severe" impairments. (*Id.*) However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17.) Upon assessing Claimant's RFC, the ALJ determined the following:

> that Claimant is able to perform sedentary work . . . except he is further restricted as follows: he can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; he can occasionally balance, stoop, crouch, and crawl; he can frequently reach in all directions with the bilateral upper extremities; he can tolerate frequent exposure to extreme cold, wetness, and vibration; he can tolerate occasional exposure to extreme heat, fumes, odors, dusts, gases, poor ventilation, and hazards; he is limited to performing simple, routine, and repetitive tasks and making simple work-related decisions; he must work in a low stress environment, defined as a routine work setting with no more than occasional changes; he can have no fast-paced production requirements and can have only occasional decision-making required; and he can have occasional interaction with supervisors and coworkers, but can have only incidental contact with the public.

(Tr. 19-20.)

The ALJ concluded that given the limitations imposed by Claimant's RFC, he was capable of performing his past relevant work as a Security Guard, DOT 372.667-034. (Tr. 27.) ALJ Hostovich noted that Claimant is "a younger individual" with "a limited education" and that "[t]ransferability of job skills is not material to the determination of disability." (Tr. 27-28.) Because the ALJ determined that Claimant was unable to perform the full range of sedentary work, he enlisted a VE to aid in his finding that Claimant is capable of working as a Product Sorter, DOT 521.687-086, or Assembler, DOT 734.687-018. (Tr. 28.) As a result, the ALJ concluded that Claimant "has not been under a disability . . . since October 22, 2019, the date the application was filed." (Tr. 29.)

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations."  *Id.* (alteration omitted).  "[T]he threshold for such evidentiary sufficiency is not high."  *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]."  *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence.  *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.    ANALYSIS

At issue is the ALJ's determination that Claimant's stated intensity, persistence, and limiting effects of depression and anxiety symptoms were not entirely consistent with the objective record evidence, which resulted in the ALJ's finding that Claimant had a sufficient RFC to perform a limited range of sedentary work. (ECF No. 12 at 1.) (citing Tr. 21, 23-24.) Claimant objects that the ALJ's finding is not supported by substantial evidence because conflicting evidence supports a different inference than the one

ultimately drawn by the ALJ, showing that the ALJ improperly cherry-picked only the evidence that supported her position. (ECF No. 12 at 12) (referring to Tr. 21, 23-24.)

The first finding to which Claimant objects is the ALJ's statement that Claimant's history of depression and anxiety shown in 2016 records later became "managed with medication, including Buspar, Seroquel, and Wellbutrin, throughout the period at issue" between 2017 and 2020. (Tr. 23.) In support of her statement, the ALJ contrasted 2016 records where Claimant reported, *inter alia*, "crying spells, decreased concentration, and a lack of motivation," with "[e]xamination in 2017," which noted

> a clean presentation, direct eye contact, intact association, normal stream of thought, intact cognitive function, and good attention and concentration. He maintained intact recent and remote memory[,] [and] [e]ven when a poor mood and affect was reported, the claimant had displayed intact cognitive function, memory, attention, and concentration.

(Tr. 23.) Claimant argues that the ALJ's "implying [of] stability" here is misleading because in the same records cited by the ALJ, Claimant continued to self-report symptoms of depression and anxiety—such as the report to his treater at OP Psychiatric Services in the spring of 2017 that he had poor mood, poor sleep, hallucinations, and an inability to "hold down a job." (ECF No. 12 at 12) (referring to, e.g., Tr. 398-429.)

Claimant argues that the treatment plans support these reported symptoms because his treaters consistently prescribed new medication or increased doses of prescribed medication during this same time period in response to his claimed symptoms. (ECF No. 12 at 12-14.) For instance, in the spring of 2017, Claimant's Seroquel dosage was increased, Buspar was increased, Paxil was added, and Wellbutrin XL was continued. (Tr. 406-409.)

This same pattern continued on into 2020.[4] (ECF No. 12 at 14.) For instance, on a June 3, 2020 appointment at WHS, it was noted that Claimant "endorse[d] anhedonia"— a reduced interest in activities and decreased ability to feel pleasure—but also reported that "he has been doing yard work and getting out of the house." (Tr. 1590-95.) The treater noted that "[i]t is unclear if this is malingering or true anhedonia[.]" (*Id.*) The ALJ found that "[s]uch observations strongly indicate that his symptoms were not as limiting as otherwise alleged. (Tr. 23.) Claimant challenges the inference that the ALJ drew from the treater's observation here as evidence that Claimant's statements were inconsistent with the objective evidence, for two reasons. (ECF No. 12 at 14.) First, during this visit Claimant reported feeling disgruntled and frustrated; further, he endorsed hallucinations, reporting that he saw his deceased father at the foot of his bed talking to him every night. (*Id.*) (referring to Tr. 1590-95.) Second, in response to Claimant's statements, the treatment plan was "to increase his Cymbalta" from 60mg to 90mg per day "for anxiety/depression" and to "increase Prazosin" from 5mg to 6mg "for PTSD symptoms." (*Id.*) (referring to Tr. 1590.) Based on these two factors, Claimant argues that, "taken in context with active hallucinations, disgruntled moods and increased dosages of psychotropic medications, it might appear that the plaintiff's providers did not agree" with the inference drawn by the ALJ. (*Id.*)

In evaluating the intensity, persistence, and severity of a claimant's subjective, stated symptoms, the ALJ must consider all of the relevant evidence on the record,[5]

---

[4] Claimant's brief sets forth additional examples of instances where, as he asserts, a different inference could be drawn from the evidence than the inference the ALJ drew. *See, e.g.*, (ECF No. 12 at 15) (referring to Tr. 23, 1004, 1597) (plaintiff's decision to stop taking psychiatric medication supported inference that he lacked insight or judgment); (ECF No. 12 at 15) (referring to Tr. 24) (challenging ALJ's reliance on Claimant's interaction with providers as evidence that Claimant had greater ability to interact with others than stated).

[5] Factors the ALJ may consider along with the record as a whole include the lack of objective medical evidence, the claimant's history, statements from the claimant, treating sources, and non-treating sources;

including all the relevant medical evidence. 20 C.F.R. § 416.945(a)(3); SSR 16-3p, 2016 WL 1119029, at *5. The ALJ "cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 98 (4th Cir. 2020). However, when an ALJ is faced with conflicting inferences and "has the unenviable task of choosing between the alternatives," her decision is supported by substantial evidence when she has carefully considered the evidence, made reasonable and supportable choices, and explained her conclusions. *McCall v. Apfel*, 47 F. Supp. 2d 723, 731 (S.D. W. Va. 1999). Thus, in reviewing the record for substantial evidence, the Court's role is not to "re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

A recent Fourth Circuit opinion illustrates the difference between an incomplete snapshot that misleadingly cherry-picks a few facts to the exclusion of other evidence on the one hand, and on the other hand, an explanation that bridges careful consideration of the evidence to a reasonable, supportable inference. *Arakas*, 983 F.3d at 98. In *Arakas*, the ALJ cherry-picked facts by highlighting portions of Arakas's medical records while disregarding or mischaracterizing other evidence from the medical records misleadingly. *Id.* at 98-99. For instance, the ALJ stated that a treating physician "assessed the claimant's fibromyalgia symptoms as moderate" during an examination; however, the

---

and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); see also Craig, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

ALJ "failed to mention" the physician's observation from the same day that Arakas's fibromyalgia symptoms were continued, that the claimant experienced severe or worsening pain and fatigue, and that her right shoulder movement was "markedly restricted." *Id.* at 99. Similarly, the ALJ "stated broadly" that the physician's treatment notes "fail[ed] to document . . . complaints of 'brain fog' or decreased concentration" when treatment notes from that physician on two different occasions "indicated respectively that Arakas 'ha[d] been unable to concentrate' and had '[d]ifficulty concentrating.'" *Id.*

The Fourth Circuit concluded that "[t]he ALJ further erred by discrediting Arakas's subjective complaints as inconsistent with her daily activities," highlighting evidence of Arakas driving or shopping while ignoring or mischaracterizing considerable testimony that the extent of these activities was limited. *Id.* (citing *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) ("An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them.")). Significantly, "[s]ubstantial evidence does not support the ALJ's conclusion that Arakas's subjective complaints were inconsistent with her daily activities, because the record, when read as a whole, reveals no inconsistency between the two." *Arakas*, 983 F.3d at 100. Thus, because "[t]he ALJ selectively cited evidence concerning tasks which [Arakas] was capable of performing and improperly disregarded her qualifying statements, . . . he failed to build an accurate and logical bridge from the evidence to his conclusion," and therefore his decision was not supported by substantial evidence. *Id.*

By contrast, in this case, the ALJ expressly considered Claimant's qualifying statements and fairly considered the record as a whole. Rather than ignoring or mischaracterizing evidence like the ALJ in *Arakas*, the ALJ's explanation connected her

careful consideration of a full picture of the evidence to a reasonable, supportable inference, and Claimant's highlighting of conflicting evidence does not reveal error.

Claimant pointed to his schedule of medication and his self-reported symptoms of poor mood, poor sleep, hallucinations, and inability to "hold down a job" to conclude that the ALJ "has disregarded all the medical evidence—evidence which remains consistent across all physicians who have ever examined the plaintiff—in exchange for selected evidence which supports the ALJ's position." (ECF No. 12 at 16.) This challenge is simply not borne out by a review of the ALJ's Decision.

First, the ALJ did not misrepresent or fail to consider Claimant's self-reported symptoms. To the contrary, the ALJ's Decision noted Claimant's self-reported hallucinations, poor mood and affect, poor sleep, suggestion that he "can't hold down a job," and endorsement of anhedonia. (Tr. 23.) The ALJ further acknowledged Claimant's dissociative symptoms, symptoms of post-traumatic stress. (*Id*.) The ALJ considered this evidence, and weighed it against more objective evidence from the medical records, including consistent notations by Claimant's providers of intact cognitive function, memory, attention, and concentration, with "slight or occasional symptoms" in response to stressors. (*Id*.) The ALJ further considered uncertainty raised by Claimant's treating providers in the record, including one provider's suggestion of malingering. (*Id*.)

Nor did the ALJ ignore the evidence of Claimant's medications, which "include[ed] Buspar, Seroquel, and Wellbutrin, throughout the period at issue." (Tr. 23.) However, the ALJ weighed this against conflicting evidence—treating providers' notation in Claimant's medical records that he stopped all his psychotropic medication on his own. (*Id*.) The ALJ also considered the evidence of Claimant's low-IQ test results. (Tr. 23-24.) However, she weighed this evidence against conflicting evidence of Claimant's activities of daily living

indicating that he lived independently, could perform personal care tasks, socialization, and appropriate interactions, and ability to engage in substantial work activity in skilled roles such as a coal miner despite his lower IQ, which was noted to be stable since childhood. (Tr. 24.)

Based upon this careful weighing of the evidence, the ALJ proceeded to draw an inference regarding the intensity, persistence and limiting effects of Claimant's symptoms. (*See id.*) She further used those limiting effects to add restrictions to the sedentary work classification. (Tr. 19.) Claimant disagrees with the inference drawn by the ALJ, arguing that, "taken in context with active hallucinations, disgruntled moods and increased dosages of psychotropic medications, it *might* appear that the plaintiff's providers did not agree" with the inference drawn by the ALJ. (ECF No. 12 at 14) (emphasis added.) Claimant's qualifying language belies the fact that this case does not present circumstances like those in *Arakas* and similar decisions, where the ALJ's analysis misrepresented a claimant's activities or selectively relied on certain evidence at the exclusion of the overall record. Rather, the ALJ here was faced with conflicting inferences and had the "unenviable task" of choosing between the alternatives. *McCall*, 74 F. Supp. 2d at 731.

Although Claimant may disagree with the ALJ's analysis and conclusions, he does not identify any material conflicting evidence that the ALJ failed to consider, or any misstatement of the record. Instead, Claimant simply asks the Court to reweigh the evidence and reach a different conclusion than the ALJ. As previously explained, the Court cannot substitute its judgment for the Commissioner. Hays, 907 F.2d at 1456. This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial

evidence and were reached through application of the correct legal standard." *Hancock*, 667 F.3d at 472. Thus, the Court can only scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. That standard is unequivocally met here, as the ALJ's Decision carefully considered the evidence, made reasonable and supportable choices, and explained her conclusions. *McCall*, 47 F. Supp. 2d at 731. Therefore, the undersigned **FINDS** that the ALJ's analysis of Claimant's RFC is supported by substantial evidence.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse or remand the Commissioner's decision (ECF No. 12), **GRANT** the Commissioner's request to affirm her decision (ECF No. 13), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Goodwin.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit

Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: March 3, 2022

Dwane L. Tinsley
United States Magistrate Judge

27